## Case No. 14,186.

### The TROPIC WIND.

[Blatchf. Pr. Cas. 64.] [1]

District Court. S. D. New York.    Nov. 1861.

PRIZE—WHO MAY SEIZE—PRACTICE—COMMUNICATING WITH ENEMY—UNREASONABLE REGULATIONS—COSTS.

1. It is competent for any person to take possession of property seizable as prize when found within the jurisdiction of the court.

2. The vessel and cargo were seized in Hampton Roads, near Fortress Monroe, by Major General Butler, of the army, and sent to New York, and there libelled as prize. *Held,* that the arrest was legal, and the suit regularly instituted.

3. Claimants of property seized as prize, who complain of irregularities, delay, and acts of negligence on the part of the captors, must proceed according to rule 23 of the standing prize rules—that is, by libel and monition, and not by special motion—to discharge the arrest.

4. Vessel and cargo, libelled for having been fraudulently employed by the master in unlawfully communicating with the enemy, released.

5. There is no public or municipal law which inhibits a neutral vessel, on a lawful voyage from Washington city to Halifax, from sailing at night on the Potomac river.

6. The questions as to what are considered, in prize law, contraband letters or dispatches, when carried to an enemy, and as to what personal intercourse with the enemy is allowed by the prize law, discussed

7. The seizure having been made on probable grounds of suspicion, the vessel and cargo were

[1] [Reported by Samuel Blatchford, Esq.]

restored without costs or damages against the captors.

BETTS, District Judge.  This vessel, her equipments, and lading, were seized in Hampton Roads, near Fortress Monroe, on the 25th of July last, by order of Major General Butler, of the United States army, commanding at Fortress Monroe, the schooner then lying near that fortress. The vessel was sent to this port upon that seizure, and was here libelled, August 5, as prize, in the above-entitled suit. The British consul, resident at this port, intervened, and filed a claim and answer, in his official character, "for the interests of the owners of the whole cargo of the above schooner as the property of British subjects," August 27; and on the 8th of October James T. Farrington and Theodore Farrington filed their claim and answer and exceptions, as owners of the vessel, to the libel. The test oath appended thereto supported the allegations of the pleadings that they are British subjects and owners of the vessel and carriers of the cargo, both of which are the property of British subjects. These facts were not controverted on the trial by the United States attorney.

The pleadings took direct issue upon the allegations of the libel that cause of capture of the vessel and cargo as prize of war existed in the facts or law of the case, and also averred that the vessel had been improperly ordered to this port for trial. That branch of the case was also made the foundation of special motions to the court to discharge the arrest of the vessel and cargo, because of irregularities in their seizure, in their not being transmitted to the District of Columbia for prosecution, and in other acts of omission or negligence on the part of the captors, in relation to the papers found on board of her when seized, and other proceedings consequent thereupon. These collateral subjects were, on the hearing, blended with the main case, and all discussed together. The decision of the court upon the merits of the case will render it unnecessary to notice more particularly these subordinate points.

In my opinion the arrest of the property seized was legal, and the suit was regularly instituted. It was of no importance to the right of action that the capture should be made by a marine force and officers of the revenue service, or other authority particularly charged with the enforcement of prize law at sea. It is competent for any person to take possession of property seizable as prize when found within the jurisdiction of the court. The Johanna Emilie, 29 Eng. Law & Eq. 562; The Rebeckah, 1 C. Rob. Adm. 227; La Rosine, 2 C. Rob. Adm. 372. The case of The Amiable Isabella, 6 Wheat. [19 U. S.] 1, captured at sea under Spanish colors by an American privateer commissioned to capture English vessels, or to recapture American vessels which had been seized by British cruisers, heard on appeal in the supreme court, in February term, 1821, presented the

question, directly, whether, in a prize suit, the action could be maintained without proof that the captors had lawful authority to make the capture in question. The point was carefully argued by distinguished counsel. The opinion of the court, delivered by Story, J., disposed of the principle, and settled definitely the practice. The court say (page 66): "A preliminary question was raised that the libel ought to be dismissed because the capture was made without public authority, and by a noncommissioned vessel. Whether this be so or not, we do not think it material now to inquire. It is a question between the government and the captors, with which the claimant had nothing to do. If the captors made the capture without any legal commission, and it is decreed good prize, the condemnation must, under such circumstances, be to the government itself. But in any view the question is matter of subsequent inquiry, after the principal question of prize is disposed of; and the government may, if it chooses, contest the right of the captors, by an interlocutory application, after a decree of condemnation has passed, and before distribution is decreed. The claimant can have no just interest in that question, and cannot be permitted to moot it before this court."

This doctrine disposes as well of the particular exception included in the answer of the owner claimants, as of the special motions made to avoid the proceedings because of alleged irregularities and want of authority in army officers to arrest the vessel, or of the sending her into this district for trial without transmitting with her the papers found on board. All these questions cease to be personal with the seizing general, and affect the United States only as vested with the whole interest in suit upon the capture, as a droit of admiralty, to their exclusive use. The relief to claimants of property seized and brought into port as prize, when any unwarrantable delay is made by the captors in bringing it to adjudication, is provided for in rule 23 of the standing prize rules. 1 Wheat. [14 U. S.] Append. 500. This established course of proceeding supplants the use of special motions resting on ex parte affidavits, as in courts of law and equity, and puts the claimants to the employment of precise allegations by libel, enforced by process of monition. Accordingly, the special motions addressed to the court in this behalf must be disregarded.

The merits in this suit rest upon the issue whether the vessel and cargo had been fraudulently employed by the master, prior to her capture, in sending dispatches to, or in other unlawful communication with, the enemy. The vessel and cargo are British property. On the 19th of April she came into the port of Richmond, from the port of Nassau, N. P., and had there laden on board a cargo of tobacco, bound for the port of Halifax, Nova Scotia, and sailed, with such cargo, from Richmond for her port of destination, on the

14th of May last, with a crew of twelve men, including a mate. She was captured by a vessel of war of the United States, in Hampton Roads, for an alleged violation of the blockade then existing, by wrongfully coming out of the port of Richmond, and was sent to Washington, and there libelled, tried, and convicted for the offence before the United States district court, in the term of June last. The sentence was remitted by the government, and on the 21st of June the vessel and cargo were delivered up to the master, on such remission, by order of the court which had condemned her, and on the 23d and 24th she proceeded, under the charge of the master and four colored men, shipped at Washington, on her voyage thence for Halifax. It seems that none of the ship's company, on board at the time she sailed from Richmond, remained with her on her release at Washington, except the master. On coming down the Potomac river, on the 24th, the schooner was brought to by the United States ship of war Pawnee, before she reached Acquia creek, and a notice was indorsed upon the certificate of release granted her by the court, "not to enter any port in Virginia, or south of it, nor to sail at night in the Potomac river." Of course, the prohibition could not be observed literally, because the vessel must necessarily continue within a port of Virginia during the period of her transit to sea. She was authorized to pursue that track by force of her discharge from arrest, and the right could not be taken away by any subsequent restriction or construction of the discharge at the arbitrary discretion of a naval officer. The palpable meaning of the warning must have been that she should afterwards avoid seeking any port in Virginia for the purpose of commercial intercourse with it, she being entitled to an undisturbed passage through and out of the waters of the state. Nor is there any legal force in the other qualification attempted to be imposed on the freedom of the vessel, "not to sail in the night on the Potomac river," because there is no public or municipal law which inhibits the vessel of a neutral power, lawfully navigating that arm of the sea, to continue on her passage at discretion. Had the evidence shown a violation by the vessel of this prohibition, she or her owners would not have incurred forfeiture thereby, or liability to arrest or detention. But, as she came off shorthanded, with only three colored seamen and no mate, the daily entries in the log, showing that the vessel anchored each night on her passage down the river, would be as satisfactory evidence of the true manner of her being sailed as the rough recollection of the sailors; and, when no probable motive for misrepresentation is established, the log would prevail, as of more reliable probability of accuracy as to those facts.

The main accusation upon which the capture was made, and that relied on by the

prosecution for condemnation of the vessel, is, that she, in fraud of her privilege as a neutral, communicated with the enemy, furnishing dispatches and other unlawful aid and comfort in furtherance of the hostilities carrying on against the United States. Sir William Scott declares that the fraudulent carrying of dispatches of the enemy by a neutral is a criminal act, which will lead to the condemnation of the neutral vessel. The Atalanta, 6 C. Rob. Adm. 458, 459. In the extended statements, in that case, of the principle on which the offence is founded, and the penalty of confiscation imposed on the vessel as the guilty instrument, Sir William Scott carefully forbears pronouncing what might be the consequence of a simple transmission of dispatches (Id. 454), i. e. (it is presumable), when no other purpose is fastened upon the agent than his being bearer or forwarder of written communications to or from an enemy. without regard to their contents, or the promotion of injurious objects thereby. Mr. Wheaton, in his adoption of the doctrine laid down in the case of The Atalanta, seems to limit its force to acts fraudulent and hostile in their nature. Wheat. Mar. Capt. c. 6, § 10. Sir William Scott interprets "dispatches," treated of in the decisions as warlike or contraband communications, to be "official communications of official persons, on the public affairs of the government." The Caroline, 6 C. Rob. Adm. 465. The cases to which he refers, and from which that definition was deduced, were essentially of that character, and, moreover, generally contained some marked element of fraud. culpable concealment, or duplicity, or evasive subterfuge. Id. 461, note. The Madison, Edw. Adm. 225, indicates clearly that the court only regards as criminal in a neutral vessel the carrying of letters or dispatches of a public nature from or to a belligerent port. The Rapid, Edw. Adm. 228. The like tone of sentiment prevails in like cases with the same eminent judge, and he manifests a strong disposition to exonerate a vessel from responsibility for transporting private letters between individuals, and to presume they were of an innocent kind, in the absence of all proof to the contrary. The Acteon, 2 Dods. 53, 54.

In the present case the libellants give no further proof respecting the transmission of dispatches on board the Tropic Wind, to persons in Virginia, than that a small box was put ashore by the master, containing some newspapers and a letter directed to his wife, who resided at Richmond. Upon that proof the court would not presume the letter was of a contraband nature, or conduced to compromise the neutral character of the vessel; but evidence given by the master, in his sworn protest, admitted with the proofs in the cause, shows that the box contained only a present of a few seashore shells, some newspapers, and a letter from the master to his wife. The stopping of the vessel at the mouth of the Rappahannock, anchoring there, or communicating with the shore by means of its boats, were none of them acts in culpable violation of her obligations of neutrality towards the United States. She was still navigating within the limits of our ports, and not proceeding inwards from the high seas towards a blockaded port. In her position there was no inhibition to her holding personal intercourse with the enemy for innocent purposes and objects. She might obtain necessary sea stores, material supplies, and those other aids in her equipment, indispensable to making the lawful voyage she was pursuing; and a sufficient complement of men to complete her voyage, would be fairly included. She was released at Washington, free to prosecute her voyage, but destitute of an adequate crew (having been carried to that port with twelve hands, and departing with four only, including a cook). The proofs do not show that she did more than to make appropriate inquiries and exertions to obtain these supplies, and, accordingly, nothing is fastened upon her doings which constituted a breach of her duty towards the United States, as a neutral and friendly vessel within their waters.

The evidence of the colored informers, upon whose charge the vessel was seized, gave probable grounds of suspicion that she harbored the intention to go up the Rappahannock to Fredericksburg, and there make sale of the colored men, or commit other acts, in intercourse with the enemy, prejudicial to the rights of the government, and in violation of her obligations as a neutral. The whole evidence, when disclosed, dissipates that suspicion, and a decree must be entered dismissing the suit, and ordering restitution of the vessel and cargo to the claimants, without costs or damages against the captors. Decree accordingly.